**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION**

| | |
|---|---|
| WSOU INVESTMENTS, LLC d/b/a BRAZOS LICENSING AND DEVELOPMENT,<br><br>       Plaintiff,<br><br>   v.<br><br>DELL TECHNOLOGIES INC., DELL INC., EMC CORPORATION, AND VMWARE, INC.,<br><br>       Defendants. | Case No. 6:20-cv-00480-ADA<br>Case No. 6:20-cv-00481-ADA<br>Case No. 6:20-cv-00485-ADA<br>Case No. 6:20-cv-00486-ADA<br><br><br>**JURY TRIAL DEMANDED** |

**<u>DEFENDANTS' CLAIM CONSTRUCTION SUR-REPLY BRIEF
REGARDING U.S. PATENT NOS. 7,092,360; 7,539,133; 7,636,309; AND 9,164,800</u>**

# TABLE OF CONTENTS

Page

I.    INTRODUCTION ................................................................................................1

II.   U.S. Patent No. 7,092,360 (Case No. -486)........................................................1

      A.    "said element comprises: an element for recording whether a queue is
            empty or occupied, an element for recording the [number of data
            cells/quantity of data] contained in a queue, an element identifying a queue
            from which data is to be output, and an element identifying a group of
            queues from which data is to be output" (Claims 1 and 26) ....................................1

      B.    "expected state for said element"; "predetermined state for said element";
            "expected value of said parameter"; "expected states for that element";
            "expected status for said element"; "expected state of said first element"
            (Claims 1, 3, 12, 13, 18, 21, 24, 26, 28, 29, 48, and 49) ..........................................2

      C.    "computer generated model" (Claims 1, 18, 21, 26, 44, and 45) ............................3

      D.    "means for . . ." terms....................................................................................4

            1.    "detection means for detecting a state of an element" (Claims 1 and 18) ........4

            2.    "comparing means for comparing the detected state with a predetermined
                  state for said element and for outputting the result of the comparison"
                  (Claims 1 and 24)..............................................................................5

            3.    "determining means for determining an expected value of said parameter"
                  (Claim 18) ........................................................................................6

      E.    "element . . ." or "element for . . ." terms........................................................7

III.  U.S. Patent No. 7,539,133 (Case No. -480) .......................................................11

      A.    "whether a congestion condition exists [on/for] the egress node" (Claims 1,
            12, and 13)......................................................................................................11

      B.    "processing the packets" (Claims 1, 12, and 13)................................................12

      C.    "such that packets associated with egress nodes for which the congestion
            condition does not exist have a different queuing priority within the load
            balancing network than packets associated with egress nodes for which the
            congestion condition exists" (Claims 1, 12, and 13).............................................14

      D.    "means for determining, for each packet, whether a congestion condition
            exists on the egress node" (Claim 12) ................................................................15

E.     "means for processing the packets such that packets associated with egress nodes for which the congestion condition does not exist have a different queuing priority within the load-balancing network than packets associated with egress nodes for which the congestion condition exists" (Claim 12) ............16

IV.     U.S. Patent No. 7,636,309 (Case No. -485)......................................................................17

A.     "split ratio vector" (Claims 1, 11, and 16) ..............................................................17

V.     U.S. Patent No. 9,164,800 (Case No. -481)......................................................................17

A.     "latency cost" (Claims 1, 13) ...................................................................................17

B.     "[determining/determine] an assignment objective" (Claims 1, 13).......................19

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Absolute Software, Inc. v. Stealth Signal, Inc.*,
    659 F.3d 1121 (Fed. Cir. 2011)..................................................................................12

*Augme Techs., Inc. v. Yahoo! Inc.*,
    755 F.3d 1326 (Fed. Cir. 2014)............................................................................15, 17

*CIAS, Inc. v. All. Gaming Corp.*,
    504 F.3d 1356 (Fed. Cir. 2007)....................................................................................1

*Dixon v. Toyota Motor Credit Corp.*,
    794 F.3d 507 (5th Cir. 2015) ...................................................................................4, 7

*ePlus, Inc. v. Lawson Software, Inc.*,
    700 F.3d 509 (Fed. Cir. 2012).....................................................................................4

*GPNE Corp. v. Apple Inc.*,
    830 F.3d 1365 (Fed. Cir. 2016)..................................................................................14

*Homeland Housewares, LLC v. Whirlpool Corp.*,
    865 F.3d 1372 (Fed. Cir. 2017)....................................................................................3

*Net MoneyIN, Inc. v. VeriSign, Inc.*,
    545 F.3d 1359 (Fed. Cir. 2008)..................................................................................16

*NNPT LLC v. Huawei Inv. & Holding Co.*,
    No. 2:14–CV–677–JRG–RSP, 2015 WL 4911846 (E.D. Tex. Aug. 17, 2015) .......................2

*Oatey Co. v. IPS Corp.*,
    514 F.3d 1271 (Fed. Cir. 2008)..................................................................................19

*Power-One, Inc. v. Artesyn Techs., Inc.*,
    599 F.3d 1343 (Fed. Cir. 2010)....................................................................................1

*RideApp Inc. v. Lyft, Inc.*,
    --- F. App'x ---, 2021 WL 1141320 (Fed. Cir. Mar. 25, 2021) .............................................5, 6

*Robert Bosch, LLC v. Snap-On Inc.*,
    769 F.3d 1094 (Fed. Cir. 2014)..................................................................................17

*SunRace Roots Enterprise Co. v. SRAM Corp.*,
    336 F.3d 1298 (Fed. Cir. 2003)..................................................................................14

**TABLE OF AUTHORITIES** *(continued)*

<u>Page(s)</u>

*Via Vadis, LLC v. Blizzard Entm't, Inc.*,
  815 F. App'x 539 (Fed. Cir. 2020) ...........................................................................................7

*Williamson v. Citrix Online, LLC*,
  792 F.3d 1339 (Fed. Cir. 2015)...............................................................................................5

## I.    INTRODUCTION

Instead of grappling with the claims and intrinsic record in accord with controlling claim construction precedent, WSOU continues to offer no more than conclusory, internally inconsistent, and legally incorrect arguments.  Notably, WSOU backtracks or takes entirely new positions on numerous claim terms, including as to "means for" terms and their corresponding structure, which WSOU had, *up until its Reply brief*, baselessly argued should not be analyzed under 35 U.S.C. § 112, ¶ 6.  WSOU's continuously shifting positions reflect the lack of merit to its arguments.

## II.   U.S. Patent No. 7,092,360 (Case No. -486)

**A.**    **"said element comprises: an element for recording whether a queue is empty or occupied, an element for recording the [number of data cells/quantity of data] contained in a queue, an element identifying a queue from which data is to be output, and an element identifying a group of queues from which data is to be output" (Claims 1 and 26)**

| Defendants' Proposal | WSOU's Proposal |
|---|---|
| "said element includes *all of*: an element for recording whether a queue is empty or occupied, an element for recording the quantity of data contained in a queue, an element identifying a queue from which data is to be output, and an element identifying a group of queues from which data is to be output" | Plain and ordinary meaning |

WSOU does not dispute in either of its briefs that the plain language of the claims requires that "said element *comprises*"—*i.e.*, includes—*all of* the four named elements that follow.  DefBr. 2–3; *see also id.* at 2 n.2 (amendments from prosecution).  WSOU merely repeats its argument that claim 1 recites "number of data cells" and claim 26 recites "quantity of data," but never explains why this is relevant to what "said element comprises" means.  ReplyBr. 1.  Although in patent law "comprises" indisputably means "including but not limited to," the jury cannot be expected to know that.  *CIAS, Inc. v. All. Gaming Corp.*, 504 F.3d 1356, 1360–61 (Fed. Cir. 2007).  Thus, Defendants' construction should be adopted to "ensure that the jury fully understands . . . what the patentee covered by the claims." *Power-One, Inc. v. Artesyn Techs., Inc.*, 599 F.3d 1343, 1348

(Fed. Cir. 2010); *NNPT LLC v. Huawei Inv. & Holding Co.*, No. 2:14-CV-677-JRG-RSP, 2015 WL 4911846, at *6 (E.D. Tex. Aug. 17, 2015) (construing term because it would "assist the jury to understand the claims," despite the plaintiff's argument that "no construction is necessary").

**B.** **"expected state for said element"; "predetermined state for said element"; "expected value of said parameter"; "expected states for that element"; "expected status for said element"; "expected state of said first element" (Claims 1, 3, 12, 13, 18, 21, 24, 26, 28, 29, 48, and 49)**

| Defendants' Proposal | WSOU's Proposal |
|---|---|
| "a [state/value] for the [element/parameter] that would be expected if the scheduler is functioning properly" | Plain and ordinary meaning |

WSOU fails to substantively address the specification's repeated and exclusive disclosure confirming the patent's purpose and focus of determining if a scheduler is "functioning properly." DefBr. 3–5. Instead, WSOU simply dismisses it with three flawed arguments. ReplyBr. 1–3.

*First*, WSOU again attempts to differentiate between claims 1 and 3 on the basis that claim 3 recites "parameter." ReplyBr. 1–2. But as Defendants have explained, their construction is focused on the "***predetermined state*** of said ***element***" (claim 1) and "***expected state*** of said ***element***" (claim 3)—***not*** claim 3's separately claimed "parameter." DefBr. 5. WSOU fails to explain why this "parameter" has any effect on the claim construction question at hand: whether, as the specification confirms, the "expected state" and "predetermined state" of an "element" refers to whether the scheduler is "functioning properly." Moreover, WSOU's argument does not address the other claims at issue, *i.e.*, independent claims 18, 21, 24, and 26.

*Second*, WSOU argues that the patent's discussion of a rule checker comparison (at 7:28–43) is a "counterexample" to Defendants' construction. ReplyBr. 2. But this passage does not contradict the specification's repeated disclosure about the claims' focus of determining if a scheduler is "functioning properly." DefBr. 3–4. Instead, the passage (at 7:40–43) only further confirms this purpose, stating that the rule checker checks "whether the test" of the scheduler "is

*passed or failed*"; in other words, if the scheduler passes the test, it is functioning properly.

*Third*, WSOU tries to distinguish certain language in the claims at issue in *Homeland Housewares, LLC v. Whirlpool Corp.*, 865 F.3d 1372 (Fed. Cir. 2017). ReplyBr. 3. WSOU misses the point. Defendants rely on *Homeland* only for its articulation of settled law: where, as here, "a patentee uses a claim term throughout the entire patent specification, in a manner consistent with only a *single meaning*, he has defined that term by implication." 865 F.3d at 1377; DefBr. 3–5.

### C.    "computer generated model" (Claims 1, 18, 21, 26, 44, and 45)

| Defendants' Proposal | WSOU's Proposal |
|---|---|
| "a simulated computer model of circuitry describing a scheduler" | Plain and ordinary meaning |

WSOU fails to substantively address the specification's consistent and repeated disclosure that resolves the claims' ambiguity about what the recited "computer generated model" *represents*, and ignores that Defendants' construction is taken *verbatim* from this disclosure. DefBr. 5–7. WSOU's two arguments only further confirm why this clarification is necessary.

*First*, relying on only two lines from claim 1, WSOU argues that Defendants "overlook[] surrounding language, which limits the 'model' in terms of what it must *provide*," stating that the model provides the "status of said element to said monitor." ReplyBr. 3. But WSOU's argument about information that the model might *provide* to the monitor says nothing about and fails to resolve the claims' ambiguity about what the model itself *represents* in the first place, *i.e.*, a "simulated computer model of circuitry describing a scheduler."

*Second*, WSOU argues that Defendants' construction is not consistent with claim 44, which recites that the "computer generated model *comprises* a file containing a functional description," and claim 45, which recites that the "computer generated model is *described* in a programming language." ReplyBr. 3–4. But these additional limitations merely relate to what the model includes (cl. 44) and how it is described (cl. 45)—*not* what the model itself *represents*. WSOU

fails to explain why, if the model is a "simulated computer model of circuitry describing a scheduler" as the specification states, the model cannot include these additional characteristics.

### D.   "means for . . ." terms

WSOU finally agrees—as it must—that 35 U.S.C. § 112, ¶ 6 applies to these "means" terms. ReplyBr. 4–5. Yet, with no explanation, WSOU has changed its position on corresponding structure. In its opening brief, WSOU stated that if these "means" terms are "deemed subject to 35 U.S.C. § 112, ¶ 6, then" the structure is "monitor having the claimed functionality." PlBr. 6, 8, 10. But now, for the first time on reply, WSOU identifies new purported structure. ReplyBr. 5. WSOU's continuously shifting positions demonstrate only that its arguments lack any merit. WSOU's new arguments are also waived.[1] *Dixon v. Toyota Motor Credit Corp.*, 794 F.3d 507, 508 (5th Cir. 2015) ("Arguments raised for the first time in a reply brief are waived.").

#### 1.   "detection means for detecting a state of an element" (Claims 1 and 18)

| Defendants' Proposal | WSOU's **Revised** Proposal |
|---|---|
| This term is subject to 35 U.S.C. § 112, ¶ 6 | |
| **Function:** detecting a state of an element | |
| **Structure:** modules 110, 112, 114 . . . to 130 using a programming language interface (PLI) as described in '360 patent, 12:11–41 | **Prior Structure:** monitor having the claimed functionality<br>**New Structure:** module 110, 112, 114, 115, 118, 120, 122, 124, 126, 128, or 130 |

WSOU now agrees to the recited function and that modules 110, 112, 114 . . . to 130 are corresponding structure. ReplyBr. 5. But WSOU tries to broaden the claims by arguing that the corresponding structure does not include the modules using a programming language interface

---

[1] WSOU also argues that, for some of these terms and those in Section II.E, Defendants waived the argument that "a means-plus-function construction for this term would allegedly require algorithmic structure." *E.g.*, ReplyBr. 6–12 nn.1–6. That is simply incorrect. "Structure" includes, for example, "using a particular piece of hardware, employing a specific source code, or following a particular algorithm." *ePlus, Inc. v. Lawson Software, Inc.*, 700 F.3d 509, 519 (Fed. Cir. 2012). Defendants made clear that the "specification lacks any [such] structure that performs the recited function," and thus did not waive what the legal framework requires. DefBr. 13.

(PLI), as described at 12:11–41, to perform the recited "detecting" function.  *Id.* at 5–6.

The Federal Circuit has made clear that a "module" itself "is a well-known nonce word," a "black box," "simply a generic description for software or hardware that performs a specified function," and "typically do[es] not connote sufficiently definite structure."  *Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1350 (Fed. Cir. 2015).  The court also has repeatedly made clear that disclosure of corresponding structure must not only "***clearly link***" the structure to the recited function, but also explain and "limit . . . ***how***" it performs the recited function.  *RideApp Inc. v. Lyft, Inc.*, --- F. App'x ---, 2021 WL 1141320, at \*3–4 (Fed. Cir. Mar. 25, 2021).

Here, the specification's ***only disclosure*** about ***how*** these black-box modules perform the recited "detecting" function is at 12:11–14, which states that the "programming language interface (PLI)" "enable[s]" "detect[ion of] the status and/or operations" of the "elements of the scheduler," and "may be instructed to ***retrieve information*** concerning" their "status" by "***calling a file defining the PLI tasks***."  DefBr. 10–11.  WSOU's only response is that the passage uses the word "may," and thus a PLI is not "always 'necessary' to perform the claimed function."  ReplyBr. 5–6.  But WSOU identifies no disclosure explaining ***how*** the modules perform the recited function ***without*** a PLI.  Thus, because the only disclosure about how these modules perform the "detecting" function is by using a PLI, the corresponding structure must include using a PLI.  Otherwise, if the structure is simply the black-box modules as WSOU proposes, this "means" term is indefinite.

> ### 2.    "comparing means for comparing the detected state with a predetermined state for said element and for outputting the result of the comparison" (Claims 1 and 24)

| Defendants' Proposal | WSOU's **Revised** Proposal |
|---|---|
| | This term is subject to 35 U.S.C. § 112, ¶ 6 |
| | **Function:** comparing the detected state with a predetermined state for said element and for outputting the result of the comparison |
| **Structure:** Indefinite | **Prior** Structure:  monitor having the claimed functionality<br>**New Structure:** rule checker 132 |

WSOU now agrees to the recited function, but rather than admit the term is indefinite it argues the corresponding structure is rule checker 132.  ReplyBr. 6.  WSOU's alleged support (*Id.* at 6–7) never "clearly links" rule checker 132 to the specific recited function or explains "how it does so."  *RideApp*, 2021 WL 1141320, at *3; DefBr. 13.  At best, WSOU's citation to 7:31–43 uses the words "compar[ing] . . . information."  ReplyBr. 7.  But this disclosure is made only in the context of "rules," and never "clearly links" rule checker 132 to the particular recited function or explains how to perform it:  "comparing the ***detected state*** with a ***predetermined state*** for said element and for outputting the result of the comparison."  Thus, the term is indefinite.  DefBr. 13.

### 3. "determining means for determining an expected value of said parameter" (Claim 18)

| Defendants' Proposal | WSOU's **Revised** Proposal |
|---|---|
| This term is subject to 35 U.S.C. § 112, ¶ 6 | |
| **Function:**  determining an expected value of said parameter | |
| **Structure:** Indefinite | **Prior Structure:**  monitor having the claimed functionality <br> <u>**New</u> Structure:**  operation(s) which apply one or more rules interrelating "the detected" state and the "expected value," as explained, for example, at 6:34-37, 6:45-58, and 9:12-11:60 |

WSOU now agrees to the recited function, but argues that the term is not indefinite because the corresponding structure is "operation(s) which apply one or more rules interrelating 'the detected' state and the 'expected value,' as explained, for example, at 6:34-37, 6:45-58, and 9:12-11:60."  ReplyBr. 7.  WSOU simply made up this structure.  None of the three passages to which WSOU cites comes close to ***clearly linking*** or explaining ***how*** any structure—including vague "operation(s)"—performs the function of "***determining*** an ***expected value*** of said parameter."

For instance, 6:34–37 states that "a rule" may "specify" the status of scheduler elements and 6:45–58 states that a monitor may be "adapted to receive information concerning the status" of an element.  But neither says anything about the process of "***determining***" anything, much less the "expected value of [a] parameter."  In addition, 9:12–11:60 discusses examples of scheduler

elements not "functioning properly" (which only further supports Defendants' construction at Section II.B), but nothing in these three columns of the patent "clearly links" any structure (including WSOU's "operation(s)") to "determining an expected value of said parameter," or explains how any structure performs that function.  Thus, the term is indefinite.  DefBr. 14–15.

E.    **"element . . ." or "element for . . ." terms**

WSOU's only argument for why Section 112, ¶ 6 does not apply to these claims reciting the nonce word "element" is that the patent "repeatedly and consistently refers to the claimed 'element' as a *structural component* (of the *scheduler*) that serves as data storage for specific information."  ReplyBr. 9.  That is false.  Nothing in the patent, including WSOU's sparse citations to it, ever states that an "element" is a ***structural component***—for ***data storage*** or otherwise.  In fact, the words "structural component" and "data storage" do not appear in the patent at all, let alone to describe an "element."  WSOU offers no other evidence that a person of ordinary skill in the art would have considered "element" to connote such structure, or why WSOU's generic "data storage" descriptor alone confers adequate structure.  *See Via Vadis, LLC v. Blizzard Entm't, Inc.*, 815 F. App'x 539, 546 (Fed. Cir. 2020) (holding indefinite claims reciting "data storage means" with no additional disclosure of structure).  Section 112, ¶ 6 therefore applies.  DefBr. 15–16.

**Corresponding Structure.**  In its opening brief, WSOU argued that if these terms are "deemed subject to 35 U.S.C. § 112, ¶ 6, then" the corresponding structure is "scheduler having the claimed functionality."  PlBr. 12, 14–15.  For the first time on reply, however, WSOU identifies new corresponding structure.  ReplyBr. 9–12.  WSOU's ever-shifting positions demonstrate only that there is no merit to its arguments.  Its new assertions are also waived.  *Dixon*, 794 F.3d at 508.

| Defendants' Proposal | WSOU's **Revised** Proposal |
|---|---|
| "element for recording whether a queue is empty or occupied" (claims 1, 5, 6, 7–9, 14–15, 20, 25, | No construction required apart from finding this term is not subject to 35 U.S.C. § 112, ¶ 6. Alternatively, if deemed subject to 35 U.S.C. § 112, ¶ 6, then, |

| 26, 30, 33–35, and 38)<br><br>**Function:** recording whether a queue is empty or occupied<br><br>**Structure:**  queue  status  register 165, 167, 201, or 203 | **Function:**  recording  whether  a  queue  is  empty  or occupied.<br><br>**Prior   Structure:**   scheduler   having   the   claimed functionality<br>**New Structure:**  data storage within a scheduler, such as, for example, queue status register 165, 167, 201, or 203 |
|---|---|

WSOU now agrees that if Section 112, ¶ 6 applies, queue status register 165, 167, 201, or 203 is corresponding structure.  ReplyBr. 9.  Nevertheless, WSOU attempts to broaden the claims by adding that the structure is "***data storage within a scheduler, such as, for example,*** queue status register 165, 167, 201, or 203."  *Id.*  As explained above, there is no disclosure in the specification concerning "data storage" as a "structural component" whatsoever, much less for this particular recited function, and thus WSOU's "data storage" addition should be rejected.  *Supra*, p. 7.

WSOU's two arguments simply don't make sense.  *First*, WSOU argues that if "queue status register" is the corresponding structure, it would "render superfluous certain claim recitations."  ReplyBr. 10.  WSOU offers no coherent explanation why, and in any event this argument directly contradicts ***WSOU's agreement*** that "queue status register" is that structure.

*Second*, WSOU argues that "it is unclear if Defendants seek[] to exclude *simulated* embodiments—*e.g.*, where the 'element for recording' is implemented as a 'simulated circuit.'" *Id.*  As an initial matter, none of the passages from the patent that WSOU cites (2:65–3:4, 4:7, 12:20–29) say anything about implementing an "element for recording" as a "simulated circuit"— they do not even use the phrase "element for recording" at all.  Regardless, WSOU asks the wrong question.  The Section 112, ¶ 6 analysis limits the corresponding structure to whatever structure the specification discloses as being "clearly linked" to the recited function.  Here, the specification explains that—as WSOU agrees—the queue status register is corresponding structure, and makes no distinction between "simulated embodiments" and non-simulated embodiments.  DefBr. 16– 17.  Thus, Defendants' position simply is that the structure is what the specification says it is.

8

| Defendants' Proposal | WSOU's **Revised** Proposal |
|---|---|
| "an element for recording the [number of [data] cells/quantity of data] contained in a queue" (claims 1, 5–6, 9, 14–15, 20, 26, 30, 33–35, and 38)<br><br>**Function:** recording the [quantity of data/number of data cells] contained in a queue<br><br>**Structure:** counter 169, 205, or 207 | No construction required apart from finding this term is not subject to 35 U.S.C. § 112, ¶ 6. Alternatively, if deemed subject to 35 U.S.C. § 112, ¶ 6, then,<br>**Function:** recording the [quantity of data / number of cells / number of data cells] contained in a queue;<br><br>**Prior** Structure: scheduler having the claimed functionality<br>**New** Structure: data storage within a scheduler, such as, for example, counter 169, 205, or 207 |

WSOU now agrees that if Section 112, ¶ 6 applies, counter 169, 205, or 207 is corresponding structure.  ReplyBr. 10.  But again WSOU attempts to broaden the claims by adding that the structure is "***data storage within a scheduler, such as, for example,*** counter 169, 205, or 207."  *Id.*  WSOU's "data storage" addition should be rejected for the reasons discussed above.  *Supra*, p. 7.  WSOU's only argument is that if "counter" is the corresponding structure, it would render superfluous limitations in claim 8—which is not even a claim that recites this term and therefore is not at issue.  Yet again, WSOU fails to explain why this is relevant and, in any event, the argument contradicts ***WSOU's agreement*** that "counter" is corresponding structure.

| Defendants' Proposal | WSOU's **Revised** Proposal |
|---|---|
| "an element identifying a queue from which data is to be output" (claims 1, 26, 5, 20, and 30)<br><br>**Function:** identifying a queue from which data is to be output<br><br>**Structure:** pointer 177, 179, 181, 183, 209, 211, 213, or 215 | No construction required apart from finding this term is not subject to 35 U.S.C. § 112, ¶ 6. Alternatively, if deemed subject to 35 U.S.C. § 112, ¶ 6, then,<br>**Function:** identifying a queue from which data is to be output<br><br>**Prior** Structure: scheduler having the claimed functionality<br>**New** Structure:  data storage within a scheduler, such as, for example, pointer 177, 179, 181, 183, 209, 211, 213, or 215 |

WSOU now agrees that if Section 112, ¶ 6 applies, pointer 177, 179, 181, 183, 209, 211, 213, or 215 is corresponding structure.  ReplyBr. 11.  But it attempts to broaden the claims by arguing that the structure is "***data storage within a scheduler, such as, for example,*** pointer . . . ."  *Id.*  WSOU's "data storage" addition is wrong for the reasons discussed above.  *Supra*, p. 7.

WSOU argues that if the corresponding structure is the "pointer," it would "risk excluding certain example embodiments."  ReplyBr. 11.  WSOU cites two lines of the patent (11:42–43) concerning a "queue identifier" as purported support.  *Id.*  The full passage (11:42–45) actually states that "*test cells* may be generated by a cell generator, each including a queue identifier (e.g., header) uniquely identifying one of the queues within the input buffer *in which the cell should be placed*."  WSOU identifies no disclosure showing that "test cells" are the same as the "data" at issue in the recited function.  Even assuming they are equivalent (and there is no support that they are), WSOU's cited passage involves the *opposite* of what the recited function requires: "identifying a queue from which data is to be *output*"—*not* a queue in which data will be *input*.

WSOU also argues that claim 27—which is not even at issue for this term—recites a "current pointer" and a "next pointer," and thus the structure cannot be limited to the "specific pointer embodiments [Defendants] identified":  pointer 177, 179, 181, 183, 209, 211, 213, or 215.  ReplyBr. 11.  But *WSOU itself* identifies *the same* "specific pointer embodiments" as corresponding structure.  *Id.*  Even if claim 27's recitation of a "current pointer" or "next pointer" mattered, the specification confirms that these pointers—which *WSOU agrees are corresponding structure*—are either a current pointer (177, 181, 209, 211) or a next pointer (179, 183, 213, 214).  *E.g.*, '360 patent, 6:1–16, 8:23–29.  Thus, WSOU's argument again makes no sense.

| Defendants' Proposal | WSOU's **Revised** Proposal |
|---|---|
| "an element [identifying/indicating] a group of queues from which data is to be output" (claims 1, 5, 9, 14–15, 20, 26, 30, 33, 35, and 38)<br><br>**Function:** [identifying/indicating] a group of queues, from which data is to be output<br><br>**Structure:** Indefinite | No construction required apart from finding this term is not subject to 35 U.S.C. § 112, ¶ 6. Alternatively, if deemed subject to 35 U.S.C. § 112, ¶ 6, then,<br>**Function:** identifying a queue from which data is to be output<br><br>**Prior Structure:** scheduler having the claimed functionality<br>**New Structure:** priority selector 173 or 208 |

10

WSOU now argues that if Section 112, ¶ 6 applies, the corresponding structure is priority selector 173 or 208.  ReplyBr. 11.  WSOU agrees that the recited function involves "*identifying*" queues from which data is to be output.  *Id.*  But the *only disclosure* WSOU cites for support relates to *selecting* queues after they have already been identified.  For instance, WSOU cites 8:14–15 and 8:47–52, which refer only to "*selecting* the 15 high or low priority queues" and "*select[ing]* the high priority queues," respectively.  ReplyBr. 12.  These passages not only fail to "clearly link" priority selector to the "identifying" function, but they also say nothing about a group of queues (the object of the function).  WSOU's other paraphrasing of the patent—namely, to insert the word "identifying" where the specification only refers to *selecting*—cannot serve as a substitute for the requisite corresponding structure.[2]  *Id.* at 12–13.  Thus, the term is indefinite.  DefBr. 19–20.

### III.     U.S. Patent No. 7,539,133 (Case No. -480)

#### A.     "whether a congestion condition exists [on/for] the egress node" (Claims 1, 12, and 13)

| Defendants' Proposal | WSOU's Proposal |
|---|---|
| "whether the egress node is currently congested" | Plain and ordinary meaning |

WSOU does not dispute that the patent defines the phrase "whether the egress node *currently has a congestion condition*" as "whether the egress node *is currently congested*."  ReplyBr. 13.  Yet WSOU asserts that this definition is inapplicable because the defined phrase recites "an extraneous 'currently' qualifier" that is "restate[d]" in the definition.  ReplyBr. 13.  WSOU is wrong and the definition is dispositive because the disputed claim term can only be understood as referring to a current "congestion condition."  The term recites whether a "congestion condition *exists*," not whether it existed or will exist, and contrasts that with whether

---

[2]  WSOU argues that Defendants "fail[] to defend[] [their] attempt to import either 'high or low priority'" into the construction.  ReplyBr. 12 n.7.  Defendants never took such a position in their responsive brief.  DefBr. 19–20.  WSOU's straw man argument therefore is misplaced.

a congestion condition "does not exist"—again, present tense.  '133 patent, 16:36–41, 18:16–24, 18:39–46.  Nor has WSOU disputed that Defendants' present-tense construction is consistent with how "congestion condition" is used throughout the specification.  *See* DefBr. 22; ReplyBr. 13.

### B.     "processing the packets" (Claims 1, 12, and 13)

| Defendants' Proposal | WSOU's Proposal |
|---|---|
| "modifying, at the ingress node, the queuing priority of packets destined for the egress node" | Plain and ordinary meaning |

The specification requires Defendants' construction by stating (1) "[t]he *present invention* modifies the queuing priority of packets on ingress nodes" and (2) "[t]he *present invention* . . . determin[es] whether to *process the packet* for *modifying the queuing priority* of the packet (or for dropping the packet at the ingress node)."  '133 patent, 2:52–59.  Statement (1) unequivocally disavows all methods and systems except for those that modify queuing priorities.  Statement (2) requires that the modification occur during the "processing the packets" step.  DefBr. 22–24.  In response, WSOU offers a raft of arguments, all of which are irrelevant.

*First*, WSOU asserts that statements "about 'the present invention'" are "not limiting" where "the specification clearly indicates the feature in question is a feature of only certain embodiments."  ReplyBr. 14 (citing *Absolute Software, Inc. v. Stealth Signal, Inc.*, 659 F.3d 1121, 1136 (Fed. Cir. 2011)).  But statement (1) contains no such "indicat[ion]," and WSOU does not contend otherwise.  WSOU's citation to *Absolute Software* is unavailing as the specification there described "[s]ome of the features that *can* be included in the *present invention*."  659 F.3d at 1137.  Statement (1) contains no permissive language.

*Second*, WSOU asserts (ReplyBr. 14) that statement (2) describes two examples of "processing the packets," and thus cannot define that term as recited in Defendants' construction.  *See* '133 patent, 2:55–59.  But as noted, the point of statement (2) is that modifying queueing priorities occurs during the "processing the packets" step, which WSOU does not dispute.  DefBr.

23.   In the same vein, WSOU asserts (ReplyBr. 14) that construing claim 1 to require modifying queuing priorities conflicts with dependent claim 4, which recites "dropping the packets." '133 patent, 16:55–58.   But modifying queuing priorities and dropping packets are not mutually exclusive—the specification describes performing them in tandem:   "the **modified queuing priority** may be utilized by other modules of the load-balancing network . . . for determining **which packets to drop** in response to a packet drop condition." '133 patent, 6:59–65.

*Third*, WSOU asserts that "example processing may still involve determining *whether* to modify." ReplyBr. 14.   Even if WSOU were correct, it would not matter because that alleged disclosure does not refute the specification's clear disavowal in statement (1). And WSOU's cited sentence ('133 patent, 6:54–59) says nothing about "determining *whether* to modify"; it describes "modifying the queuing priority associated with the packet."

*Fourth*, WSOU erroneously argues that if Defendants' construction were correct, claim 5 would have recited "reassigning" or "modifying" certain queuing priorities instead of "assigning." ReplyBr. 14.   But the patent establishes that "assigning" a "lower queuing priority," as recited in claim 5, is necessarily a reassignment and a modification.   That is because, by default, all packets are unmarked, and thus have a high queueing priority.   *See, e.g.*, '133 patent, 5:24–27, 6:54–59. Thus, in assigning a "lower queuing priority" (i.e., by "marking" the packet), the system is "reassigning" and "modifying" the packet's queuing priority.

*Finally*, WSOU argues that the "determining an egress node" limitation "pertains to a *distinct* step of claim 1" that does not "expressly limit where the claimed 'processing' must occur." ReplyBr. 15.   That is not Defendants' argument.   Defendants' argument, to which WSOU has no response, is that the recitation of "traffic flow received at an **ingress node**" is consistent with the patent's clear disavowal and the point of the "present invention."   DefBr. 24; ReplyBr. 15.

13

**C.**   **"such that packets associated with egress nodes for which the congestion condition does not exist have a different queuing priority within the load balancing network than packets associated with egress nodes for which the congestion condition exists" (Claims 1, 12, and 13)**

| Defendants' Proposal | WSOU's Proposal |
|---|---|
| "such that packets are marked depending on whether they are destined for a congested egress node, such that marked packets have a different probability of being dropped" | Plain and ordinary meaning |

WSOU does not dispute that the specification dictates that a "queuing priority" (1) is indicated by marking a packet depending on whether it is destined for a congested egress node and (2) indicates the probability that the packet will be dropped along the way.  DefBr. 25–26; ReplyBr. 15.  WSOU's acquiescence is dispositive.

WSOU's only remaining argument, claim differentiation, is a presumption that is overcome where, as is uncontested here, "the specification or prosecution history dictates a contrary construction."  *GPNE Corp. v. Apple Inc.*, 830 F.3d 1365, 1371 (Fed. Cir. 2016).  Defendants' construction recites features distinct from the limitations recited in claims 4 and 6.  As Defendants have established and WSOU has not disputed (DefBr. 27; ReplyBr. 15), claim 4 recites "dropping the packets," which is distinct from the "probability of being dropped" recited in the construction. Claim 6, which depends from claim 5, recites an affirmative "marking" step that is included in the "assigning" step recited in claim 5, both of which are absent from Defendants' construction.  '133 patent, 16:66–17:3.  WSOU also cites *SunRace Roots Enterprise Co. v. SRAM Corp.*, 336 F.3d 1298 (Fed. Cir. 2003) as establishing it is entitled to a "strong presumption."  ReplyBr. 15.  But *SunRace* holds that claim differentiation is especially strong "when the limitation in dispute is the only meaningful difference between an independent and dependent claim."  336 F.3d at 1303. That is not the case here.  Claim 4 recites "dropping the packets" and claim 6 recites "allowing pass through of packets"—neither of which is recited in claim 1.  '133 patent, 16:57–58, 17:4–6.

14

### D.     "means for determining, for each packet, whether a congestion condition exists on the egress node" (Claim 12)

| Defendants' Proposal | WSOU's Proposal |
|---|---|
| This term is subject to 35 U.S.C. § 112, ¶ 6; **Function:** determining, for each packet, whether a congestion condition exists on the egress node | |
| **Structure:** Indefinite | **Structure:**  processor 210 performing operations at '133 patent, 5:11-20 |

Defendants established that the claimed function is performed by a general-purpose processor (e.g., processor 210), but the specification does not provide the requisite algorithm—it does not disclose how to determine whether a congestion condition exists.  DefBr. 27–28.  WSOU agrees that the corresponding structure must include processor 210, and WSOU does not dispute it is a general-purpose processor.  ReplyBr. 15–16.  Recognizing an algorithm is therefore required, WSOU argues that the operations described at 5:11–20 disclose the requisite algorithm.  ReplyBr. 16.  But that passage merely ***recites*** the claimed function—"processor 210 determines the egress node congestion status associated with the identified egress node"—it says nothing about ***how*** it does so.  That is dispositive and compels holding claim 12 indefinite.  *Augme Techs., Inc. v. Yahoo! Inc.*, 755 F.3d 1326, 1337 (Fed. Cir. 2014) (holding that the specification "must disclose *some* algorithm; it cannot merely restate the function recited in the claim") (emphasis in original).

The other passages that WSOU identifies (ReplyBr. 16) are irrelevant as they are not part of the structure WSOU identifies, and are insufficient in any event.  They merely describe storing, retrieving, and conveying "congestion condition information," not, as the recited function requires, how that information is determined in the first place.  '133 patent, 3:3–6, 5:39–51, 5:65–6:12.

Lastly, while WSOU cannot dispute that an algorithm is required, it erroneously asserts that Defendants' position is inconsistent with their position on "means for determining an egress node," which is not disputed.  ReplyBr. 16.  Defendants' identification for that term was not limited to processor 210—it also included "switch 230, and one or more routing tables associated with

15

switch 230" (PlBr. 21)—so no algorithm was required.  For this disputed term, the parties agree that the structure is limited to a general-purpose processor, and thus an algorithm is required.  *Net MoneyIN, Inc. v. VeriSign, Inc.*, 545 F.3d 1359, 1367 (Fed. Cir. 2008) ("[A] means-plus-function claim element for which the only disclosed structure is a general purpose computer is invalid if the specification fails to disclose an algorithm for performing the claimed function.").

**E.**   **"means for processing the packets such that packets associated with egress nodes for which the congestion condition does not exist have a different queuing priority within the load-balancing network than packets associated with egress nodes for which the congestion condition exists" (Claim 12)**

| Defendants' Proposal | WSOU's **Revised** Proposal |
|---|---|
| This term is subject to 35 U.S.C. § 112, ¶ 6. | |
| **Function:** processing the packets such that packets associated with egress nodes for which the congestion condition does not exist have a different queuing priority within the load-balancing network than packets associated with egress nodes for which the congestion condition exists | |
| **Structure:** processor 210 which marks the packets such that marked packets have a different probability of being dropped than unmarked packets | **Structure:** processor 210 which marks packets in a manner that differentiates queuing priority based on whether the packets are associated with egress nodes for which the congestion condition exists |

WSOU now agrees that the corresponding structure is processor 210 (a general purpose processor) and the algorithm requires marking packets.  ReplyBr. 16–17.  The only dispute is whether the processor must mark packets such that marked and unmarked packets have different drop probabilities (Defendants' position) or in a manner that "differentiates queuing priority" (WSOU's position).  Defendants' position is correct because the patent consistently states that processing packets to have differing queuing priorities is performed by marking packets such that the marked packets are dropped with a different probability than unmarked packets, and WSOU does not contend otherwise.  DefBr. 30; ReplyBr. 17.

WSOU criticizes Defendants' construction, asserting that the patent does not "unambiguously disclaim" differing queuing priorities.  ReplyBr. 17.  But "disclaimer" is not the issue for means-plus-function limitations.  The "construction" of these limitations is an

"identif[ication of] the 'corresponding structure, material, or acts described in the specification' to which the claim term will be limited." *Robert Bosch, LLC v. Snap-On Inc.*, 769 F.3d 1094, 1097 (Fed. Cir. 2014) (citation omitted).  WSOU's proposal does not recite how the claimed function is performed—it parrots the claimed function after replacing "processing" with "marking." *Augme Techs.*, 755 F.3d at 1337 (restating the claimed function is insufficient).

In support of its irrelevant "disclaimer" argument, WSOU argues that the patent describes "marking" without "mentioning" differing drop probabilities.  ReplyBr. 17 (citing '133 patent, 9:51–10:2).  But the cited passage expressly links "dropping" and "marking," stating that "marked packets . . . are dropped before unmarked packets." '133 patent, 9:65–10:1.  And the patent consistently teaches that dropping marked packets before unmarked ones is an example of dropping marked packets with higher probability. '133 patent, 7:26–39, 8:15–26, 8:64–9:7.

## IV.     U.S. Patent No. 7,636,309 (Case No. -485)

### A.     "split ratio vector" (Claims 1, 11, and 16)

| Defendants' Proposal | WSOU's **Revised** Proposal |
|---|---|
| **Agreed Construction:**  "the proportion of the flow routed in each path" | |

## V.      U.S. Patent No. 9,164,800 (Case No. -481)

### A.     "latency cost" (Claims 1, 13)

| Defendants' Proposal | WSOU's Proposal |
|---|---|
| "communication delay between a compute node and a data node" | Plain and ordinary meaning |

WSOU now "disputes that 'latency cost' refers exclusively to communication delay." ReplyBr. 17; *see contra* PlBr. 25–26 (not disputing this point).  While ignoring Defendants' numerous patent citations showing that latency and communication delay are synonymous (DefBr. 33), WSOU points to one sentence that it erroneously contends reveals an inconsistency.  ReplyBr. 17–18 (citing '800 patent, 6:54–57).  That alleged inconsistency is a product of WSOU's comparing apples to oranges.  Specifically, the patent teaches that, to account for the total

communication delay from a "higher volume of data," the per-unit communication delay "may also be weighted by the amount of data to be processed." '800 patent, 6:53–54. While WSOU asserts that this sentence means that it is possible "for latency cost to be high (e.g., due to substantial increased traffic) even if communication delay is low" (ReplyBr. 17), what it plainly means is that it is possible for the ***total communication*** delay (the sum of the communication delay and what WSOU calls the "latency cost") to be high while the ***per-unit*** delay (what WSOU calls the "communication delay") is low. "Latency cost" and "communication delay" are completely consistent and, in the context of the '800 patent, coextensive.

Defendants also established that because independent claims 1 and 13 require the "latency cost" be "used in obtaining a set of assignments" and the intrinsic record requires that "assignments" be between compute and data nodes, the "latency cost" must be the communication delay between a compute node and a data node. DefBr. 33–35. WSOU erroneously cites two sentences as supporting its allegation that the "claim language" does not "preclude" the claimed "set of assignments" from "pertaining" to multiple compute nodes cooperating to perform a processing task. ReplyBr. 18 (citing '800 patent, 1:37–41, 8:10–12). But as Defendants established and WSOU did not specifically dispute, the "claim language" ***does*** "preclude" assignments between multiple compute nodes. DefBr. 33–34. Neither of WSOU's cites refutes that conclusion. The first passage (1:37–41) says nothing about assignments. The second passage (8:10–12) supports Defendants—it states that a "data node may be processed by two compute nodes" (or vice versa). So the assignments are still compute/data node assignments, *i.e.*, two compute nodes can be assigned to the same data node (or vice versa). '800 patent, 8:14–20. WSOU also repeats its irrelevant allegation that the specification "contemplates" a communication latency between compute nodes. ReplyBr. 18. What matters is that the specification consistently

describes *assignments* as being between compute and data nodes, which WSOU does not dispute.

**B.     "[determining/determine] an assignment objective" (Claims 1, 13)**

| Defendants' Proposal | WSOU's Proposal |
|---|---|
| "select[ing] one of a plurality of assignment objectives" | Plain and ordinary meaning |

WSOU's Reply is telling as it sidesteps the applicants' unmistakable prosecution history disclaimer.  *See* ReplyBr. 18–19; DefBr. 35–36.  WSOU states that "*[r]egardless of whether prosecution disclaimer applies* to the one embodiment Dell identified, Dell misinterprets the specification as only disclosing two alternative embodiments."  ReplyBr. 18.  But "whether prosecution disclaimer applies" is dispositive.  Because it applies, all other embodiments are disclaimed irrespective of how many others there may be.  *Oatey Co. v. IPS Corp.*, 514 F.3d 1271, 1277 (Fed. Cir. 2008) ("[W]e have interpreted claims to exclude embodiments of the patented invention where those embodiments are clearly disclaimed in the specification . . . or prosecution history.").  WSOU does not dispute this disclaimer, so WSOU's dispute over the number of embodiments disclaimed and what those disclaimed embodiments allegedly disclose is irrelevant.

WSOU also criticizes Defendants for allegedly "opt[ing] to not even take a position in its response brief as to whether its proposed construction" requires all of the "plurality of assignment objectives" recited in the construction to be based on a latency cost.  ReplyBr. 19.  That is false.  Defendants stated that their "construction does not require that all of the assignment objectives must be based on a latency cost."  DefBr. 36.  Finally, WSOU argues that Defendants "fail[ed] to defend its apparent attempt to limit the claim language to selecting only 'one' of allegedly multiple assignment objectives."  ReplyBr. 19.  The "one" assignment objective comes directly from the applicants' remarks, which disparaged prior art for not providing an "opportunity to determine *which assignment objective* is to be achieved."  Dkt. 82-12 at 15.  That statement disclaims contrary embodiments, and thus WSOU's cite to the specification is irrelevant.

Dated:  April 14, 2021

By:  */s/ Barry K. Shelton*
_____

Barry K. Shelton
Texas State Bar No. 24055029
bshelton@sheltoncoburn.com
**SHELTON COBURN LLP**
311 RR 620, Suite 205
Austin, TX  78734-4775
Telephone:  512.263.2165
Facsimile:  512.263.2166

Benjamin Hershkowitz
bhershkowitz@gibsondunn.com
Brian A. Rosenthal
brosenthal@gibsondunn.com
Allen Kathir
akathir@gibsondunn.com
Kyanna Sabanoglu
ksabanoglu@gibsondunn.com
**GIBSON, DUNN & CRUTCHER LLP**
200 Park Avenue
New York, NY  10166-0193
Telephone:  212.351.4000
Facsimile:  212.351.4035

Y. Ernest Hsin
ehsin@gibsondunn.com
Jaysen S. Chung
jschung@gibsondunn.com
**GIBSON, DUNN & CRUTCHER LLP**
555 Mission Street, Suite 3000
San Francisco, CA  94105-0921
Telephone:  415.393.8200
Facsimile:  415.393.8306

Ryan K. Iwahashi
riwahashi@gibsondunn.com
**GIBSON, DUNN & CRUTCHER LLP**
1881 Page Mill Road
Palo Alto, CA  94304-1211
Telephone:  650.849.5300
Facsimile:  650.849.5333

*Attorneys for Defendants*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that on April 14, 2021, all counsel of record who are deemed to have consented to electronic service are being served with a copy of this document through the Court's CM/ECF system under Local Rule CV-5(b)(1).

*/s/ Barry K. Shelton*
Barry K. Shelton
